Rick D. BATY and Baty & Associates
Insurance Agency, Inc.,
Appellants,

v.

PROTECH INSURANCE AGENCY,
Connie Suzanne Malliaros, Treva C.
Neill, Aetna Life & Casualty Co., ITT
Hartford Fire Insurance Co., American Medical Security, Inc., and Fidelity & Deposit Company of Maryland,
Appellees.

No. 14–99–00201–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Nov. 29, 2001.

Rehearing Overruled Jan. 24, 2002.

William R. Burke, Jeff Nobles, Houston, for appellants.

Louis K. Bonham, Joy Sadler, Marc R. Stanley, Houston, Roger L. Mandel, Dallas, for appellees.

---

* Former Justice Maurice Amidei sitting by assignment.

1. Although Aetna was the original party to this suit, Travelers Casualty & Surety Co.

Panel consists of Justices ANDERSON, FROST and AMIDEI.*

## OPINION ON REHEARING

KEM THOMPSON FROST, Justice.

This case arises out of a dispute between an insurance agency and two of its former officers and shareholders who formed a competing business. After initially settling some of their claims, the insurance agency, appellant Baty & Associates Insurance Agency, Inc. ("BAI") and its remaining shareholder, appellant Rick D. Baty ("Baty"), brought suit against the former officers, appellees Connie Suzanne Malliaros ("Malliaros") and Treva C. Neill ("Neill") and their new company, appellee ProTech Insurance Agency ("ProTech"), claiming the individuals had breached their fiduciary duties and had wrongfully diverted BAI's business to ProTech. BAI and Baty also sued four insurance companies whom BAI claims wrongfully interfered in BAI's existing and prospective business relationships and conspired with its former fiduciaries to steal BAI's customers. The trial court granted summary judgement in favor of ProTech, Malliaros, Neill, and all four insurance companies. In our original opinion, we affirmed, in part, and reversed and remanded, in part.

Now pending before the court are the motions for rehearing filed by the four insurance companies, appellees Aetna Life & Casualty Co. ("Aetna"),[1] ITT Hartford Fire Insurance Co. ("Hartford"), American Medical Security, Inc. ("AMS"), and Fidelity & Deposit Company of Maryland ("Fidelity"). The motions for rehearing filed by Aetna, AMS, and Fidelity are granted. Hartford's motion for rehearing is granted,

later acquired Aetna. For simplicity, we refer to Aetna and Travelers as "Aetna."

in part, and overruled, in part. We reverse the portion of the trial court's summary judgment dismissing the tort claims of Baty and BAI against Malliaros, Neill, and ProTech, and we remand those claims for further proceedings. We reverse the trial court's summary judgment in favor of Hartford as to the claims of Baty and BAI for tortious interference with prospective business relationships and remand those claims for further proceedings. We affirm the trial court's summary judgment in favor of Aetna, AMS, and Fidelity as to BAI's claims for tortious interference with prospective business relationships. We affirm the trial court's summary judgment in favor of Aetna, Hartford, AMS, and Fidelity as to BAI's claims for tortious interference with existing contracts, inducing the breach of a fiduciary duty, and civil conspiracy. We withdraw our opinion of April 5, 2001, and we substitute this opinion in its place.

## I. FACTUAL AND PROCEDURAL BACKGROUND

BAI is an independent insurance agency authorized to sell property, casualty, life, and health insurance. Baty is the president and part owner of BAI. In 1992, BAI employed Malliaros and Neill as sales representatives. Shortly thereafter, they became officers of the company. In April 1993, Malliaros and Neill each purchased ten percent of BAI stock, becoming shareholders of the company along with Baty. In connection with this purchase of BAI stock, Malliaros, Neill, and Baty entered into an "Agreement Between Shareholders." This agreement contained covenants not to compete.

In 1994, Malliaros and Neill began making plans to start their own insurance agency, ProTech. On August 31, 1994, Malliaros and Neill resigned from BAI. The next day, ProTech commenced business in competition with BAI. ProTech, in furtherance of its business, entered into agency agreements with various insurance companies, including Aetna, Hartford, AMS, and Fidelity.

About a week after Malliaros and Neill resigned, BAI brought suit against them, seeking to enforce the covenants not to compete. BAI asserted claims of breach of contract, breach of fiduciary duty, and unjust enrichment against Malliaros and Neill. BAI also joined ProTech as a defendant in the suit. In November 1994, BAI, Baty, Malliaros, and Neill entered into a "Settlement and Rescission Agreement" pursuant to which (1) Malliaros, Neill, and Baty agreed to rescind the "Agreement Between Shareholders," (2) Malliaros and Neill agreed to return their stock to BAI, (3) BAI, in turn, agreed that the covenants not to compete were no longer of any effect; and (4) all parties agreed to dismiss their claims without prejudice. As part of the settlement, Baty and BAI released claims against Malliaros, Neill, and ProTech. The scope of the release is the subject of dispute in this case.

After entering into the settlement agreement, Baty and BAI filed a second suit (this case) against Malliaros, Neill, and ProTech. Baty asserted libel and slander claims; BAI asserted claims for business disparagement, breach of fiduciary duty, unjust enrichment, tortious interference with existing contracts and prospective business relationships, and civil conspiracy. In this second lawsuit, BAI also brought claims against Aetna, Hartford, AMS, and Fidelity, alleging these insurance companies tortiously interfered with its contracts and prospective business relationships and induced Malliaros and Neill to breach the fiduciary duties they, as officers and employees, owed to BAI. Baty and BAI bring this appeal from the summary judgments in favor of the appellees on all of appellants' claims.

## II. Summary Judgment Standard of Review

To prevail on a motion for summary judgment, a defendant must establish that no material fact issue exists and that it is entitled to judgment as a matter of law. *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222 (Tex.1999). If a defendant moves for summary judgment on the basis of an affirmative defense, it has the burden to prove conclusively all the elements of the affirmative defense as a matter of law. *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999). In conducting our review of the summary judgments, we take as true all evidence favorable to the nonmovants, and we make all reasonable inferences in the nonmovants' favor. *Id.*

■ On review of a no-evidence summary judgment, we consider the evidence in the light most favorable to the nonmovants and disregard all evidence and inferences to the contrary. *Blan v. Ali*, 7 S.W.3d 741, 747 (Tex.App.—Houston [14th Dist.] 1999, no pet.). We sustain a no-evidence summary judgment if: (1) there is a complete absence of proof of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *Dagley v. Haag Eng'g Co.*, 18 S.W.3d 787, 793 (Tex.App.—Houston [14th Dist.] 2000, no pet.). More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Isbell v. Ryan*, 983 S.W.2d 335, 338 (Tex.App.—Houston [14th Dist.] 1998, no pet.). Although the non-moving party is not required to marshal its proof, it must present evidence that raises a genuine fact issue on the challenged elements. *Risner v. McDonald's Corp.*, 18 S.W.3d 903, 907 (Tex.App.—Beaumont 2000, pet. denied).

## III. Analysis

### A. Scope of Settlement Agreement's Release and Rescission Provisions

Malliaros, Neill, and ProTech moved for summary judgment on all of the claims Baty and BAI asserted against them on the stated ground that Baty and BAI had released those claims in the settlement agreement. Similarly, Aetna, Hartford, AMS, and Fidelity each moved for summary judgment on the claims BAI asserted against them, alleging that because those claims are derivative of BAI's tort claims against Malliaros, Neill, and ProTech, the settlement agreement also released the claims against the insurance companies.

BAI based its breach of fiduciary duty claims on Malliaros and Neill's actions as agents and officers of BAI prior to leaving their employment. BAI claims these actions included unauthorized use of time and effort to set up a competing business, misappropriation of BAI's confidential information for the benefit of their new competing business, solicitation of BAI's employees, failure to disclose their improper activities to BAI's principal officer and shareholder (Baty), and diversion of BAI's clients to ProTech. BAI's factual allegations with respect to Malliaros and Neill's alleged breaches of their fiduciary duties in the first lawsuit are essentially the same as the factual allegations set forth in the current litigation.[2] Our task is to deter-

---

2. BAI alleged, in relevant part, in the first lawsuit:

[I]t appears that Neill, and Malliaros had taken substantial advance preparations to

mine whether the claims asserted in the second suit are barred by the release and/or rescission provisions of the "Settlement and Rescission Agreement."

### 1. Release

 A release is a writing which provides that a duty or obligation owed to one party to the release is discharged immediately on the occurrence of a condition. *National Union Fire Ins. Co. v. Insurance Co. of N. Am.*, 955 S.W.2d 120, 127 (Tex. App.—Houston [14th Dist.] 1997), *aff'd*, 20 S.W.3d 692 (Tex.2000). Like any other agreement, a release is subject to the rules of construction governing contracts. *Grimes v. Andrews*, 997 S.W.2d 877, 881 (Tex.App.—Waco 1999, no pet.). When construing a contract, courts must give effect to the true intentions of the parties as expressed in the written instrument. *Lenape Resources Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996). The contract must be read as a whole, rather than by isolating a certain phrase, sentence, or section of the agreement. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex.1995). The language in a contract is to be given its plain grammatical meaning unless doing so would defeat the parties' intent. *DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex.1999).

 Although oral statements regarding the parties' intentions are inadmissible to vary or contradict the terms of the agreement, the court may examine prior negotiations and all other relevant incidents bearing on the intent of the parties. *Cook Composites, Inc. v. Westlake Styrene*

*Corp.*, 15 S.W.3d 124, 132 (Tex.App.—Houston [14th Dist.] 2000, pet. dism'd). Such an examination assists the court in ascertaining the object and purpose of the contractual language the parties chose to include in the written instrument. *Id.* The court should construe a contract by considering how a reasonable person would have used and understood such language, considering the circumstances surrounding its negotiation and keeping in mind the purposes which the parties intended to accomplish by entering into the contract. *National Union Fire Ins. Co.*, 955 S.W.2d at 127.

 To effectively release a claim, the releasing instrument must "mention" the claim to be released. *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex.1991). Any claims not "clearly within the subject matter" of the release are not discharged, even if those claims exist when the release is executed. *Id.* It is not necessary, however, for the parties to anticipate and identify every potential cause of action relating to the subject matter of the release. *Keck, Mahin & Cate v. National Union Fire Ins. Co.*, 20 S.W.3d 692, 698 (Tex.2000). Although releases generally contemplate claims existing at the time of execution, a valid release may also encompass unknown claims and damages that develop in the future. *Id.*

The settlement agreement at issue here states, in relevant part:

> The Agreement Between Shareholders (the "Agreement") dated April 27, 1993, between and among Neill, Baty, Malliaros, and [BAI] (Exhibit 1) is hereby rescinded and declared to be of no fur-

---

go into competition with Baty and Associates prior to the time of their resignation and while they were employees and corporate officers owing a fiduciary obligation toward Baty and Associates. The efforts taken by Neill and Malliaros, prior to their

resignation, which on information and belief included contacts and negotiations with insurers and solicitation of existing and potential customers of Baty and Associates, were in breach of their fiduciary obligations to Baty and Associates.

ther force and effect to the same extent as if the Agreement were never executed.... Likewise, Baty and [BAI] specifically agree that *the non-compete and non-solicitation provisions in Article 9.6 of the Agreement Between Shareholders or any similar provision or covenant, whether written or otherwise,* at law or in equity, are of no force and effect. Baty and [BAI] *waive and release any claim against Neill [and Malliaros] and/or ProTech based upon any alleged non-compete and/or non-solicitation agreement, covenant, or provision,* known or unknown, whether now existing or which may arise in the future. The parties specifically agree that after the effective date of this Settlement and Rescission Agreement, no party shall have any obligations to any other *under the provisions of the Agreement Between Shareholders,* and each party releases each of the other parties from *any claims under the Agreement Between Shareholders* existing as of the date of this Settlement and Rescission Agreement.[3]

The covenant not to compete in the "Agreement Between Shareholders," to which the settlement agreement specifically refers, states, in relevant part:

9.6 *Covenant Not to Compete.* In consideration for the agreements of [BAI] herein contained, Employee agrees that for a period of two (2) years *following the termination of her employment,* whether such termination is voluntary, or involuntary, with or without cause, Employee will not, directly or indirectly, for herself or by or on behalf of any other person, firm, corporation, partnership or other entity, solicit insurance business from any customers of [BAI], or from any other prospective

customers whom she may have solicited in the one (1) year period preceding the date of termination of employment.[4]

■ Baty and BAI maintain that their tort claims are not "clearly within the subject matter" of the settlement agreement because the release language is expressly limited to claims arising under the "Agreement Between Shareholders" and does not specifically state that tort claims are being released. We agree.

■ When a release contains language which evinces a specific intent to cover tort claims as well as contract claims, courts will not hesitate to find the claims were released. *See, e.g., Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 180–81 (Tex.1997) (holding that a release, which released all "causes of action of whatsoever nature, or any other legal theory arising out of the circumstances described above, and from any and all liability damages of any kind known or unknown, whether in *contract or tort,*" released fraudulent inducement claims) (emphasis added). Likewise, courts will construe broadly drafted releases to encompass a wide variety of claims. *See, e.g., Anheuser–Busch Companies v. Summit Coffee Co.,* 858 S.W.2d 928, 934 (Tex.App.—Dallas 1993 writ denied), *vacated on other grounds,* 514 U.S. 1001, 115 S.Ct. 1309, 131 L.Ed.2d 192 (1995) (finding that a release, which released "any and all causes of action of *any nature whatsoever, at common law, statutory or otherwise,*" included fraud and securities law claims because the release, by reference to the stock purchase agreement, mentioned all claims involving undisclosed liabilities, a specific class of claims which included the claims at issue)

3. Emphasis added.

4. Emphasis added.

(emphasis added).[5] However, the settlement agreement at issue here is not a broad form general release. It does not purport to release claims of "any nature whatsoever;" it does not even mention tort claims. Rather, it is expressly restricted to claims relating to "any alleged non-compete and/or non-solicitation agreement, *covenant or provision*"[6] and "claims under the Agreement Between Shareholders," i.e., contract claims.

Appellees do not dispute the settlement agreement lacks specific language releasing the tort claims; rather, they argue, that because the settlement agreement does not expressly reserve or otherwise except the tort claims from its coverage, the court should read the settlement agreement as encompassing these claims. While including contractual language that expressly reserves or excepts claims intended to be preserved from the effects of a release may be prudent practice to avoid the time and expense of litigating the issue, Texas law imposes no such requirement.[7]

**5.** *See also Memorial Med. Ctr. of E. Tex. v. Keszler*, 943 S.W.2d 433, 434–35 (Tex.1997) (finding that a release, which stated that the parties agreed to release all claims related to corrective action by Memorial against Keszler "and *any other matter relating to [Keszler's] relationship with [Memorial]* " was not limited to claims regarding corrective action, but released all claims relating to Keszler's relationship with Memorial, including the ethelyne dioxide exposure claim) (emphasis added); *Vera v. North Star Dodge Sales, Inc.*, 989 S.W.2d 13, 18 (Tex.App.—San Antonio 1998, no pet.) (finding that a release, which operated to "release[ ] North Star Dodge from any and all liability regarding the purchase of a 1993 Mazda Protg [sic]," was not limited to claims concerning the purchase of the vehicle, but also included unlawful debt collection, conversion, and wrongful repossession claims because the terms of the purchase were not satisfied).

**6.** Emphasis added. The words "covenant" and "provision" are terms generally associated with contracts and written instruments, not torts. A "covenant" is a "formal agreement or promise, usu[ally] in a contract." BLACK'S LAW DICTIONARY 369 (7th ed.1999). A "provision" is a "clause in a statute, contract or other legal instrument." *Id.* at 1240.

**7.** *See, e.g., Keck, Mahin & Cate*, 20 S.W.3d at 698 (holding that a release, which released claims "directly or indirectly attributable to the rendition or [sic] professional legal services by KMC to Granada between June 1, 1998 and April 1, 1992," did not release legal malpractice claims arising after April 1, 1992); *Brady*, 811 S.W.2d at 939 (finding that although the release agreement released all claims attributable to a specific loan transaction between a bank and its customer, it did not cover a new loan transaction between the bank and the same customer, which was the subject of subsequent litigation); *Grimes*, 997 S.W.2d at 884 (finding that the appellant's claims for wrongful termination and discrimination, which were filed in federal court, were not released in a settlement agreement referring only to the state court cause number under which the appellant's workers' compensation claim was filed); *Vela v. Pennzoil Producing Co.*, 723 S.W.2d 199, 204 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.) (finding that where a release agreement referred only to the "dispute as to the validity of said lease" and the appellants' desire to ratify the lease as part of the settlement of that dispute, it did not cover the claims of improper pooling and unitization of the appellants' land in violation of the lease asserted in the second lawsuit, in spite of broad language stating "all damages, claims or causes of action claimed or asserted against Pennzoil"); *Johnson v. J.M. Huber Corp.*, 699 S.W.2d 879, 883 (Tex.App.—Amarillo 1985, writ ref'd n.r.e.) (holding that a release, which released claims for damages from underground water pollution for two specific tracts of land, did not release claims related to a third tract which was not expressly mentioned in the release); *Houston Oilers, Inc. v. Floyd*, 518 S.W.2d 836, 838 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.) (holding that a release executed in workers' compensation action, which released "any and all claims . . . of whatever nature arising out of and resulting from the alleged injury accident of August 23, 1968 and of and from any and all claims . . . for liability for medical aid, hospi-

The scope of coverage of a release is determined by the terms of the agreement between the parties. Here, the settlement agreement contains no language expressly releasing the tort claims BAI and Baty asserted against Malliaros, Neill, and Pro-Tech in the first suit. Appellees, however, contend the language in the settlement agreement is nevertheless broad enough to encompass the tort claims. In support of this contention, appellees argue that the claims based on Malliaros and Neill's alleged pre-resignation activities, which are the subject of the second lawsuit, fall within the scope of the release because the duties involved and the conduct alleged to constitute the breaches of those duties were covered in the subject matter of the "Agreement Between Shareholders." The provision in the shareholders' agreement on which appellees rely, states:

> 9.2 *Duties.* The duties to be performed by Employee shall be those of an account executive, including those duties associated with servicing existing clients and developing, producing and closing new business clients. Employee shall perform such other incidental work as may be assigned to her which is commensurate with Employee's position and compensation level in accordance with the instructions, directions and under the control of Employer, [sic] Employee shall devote her full time efforts to the business of Corporation, and shall not undertake any other business activities during the term of this Agreement

which would limit her abilities to perform services for the Corporation.

Appellees argue that the common law duties of loyalty BAI claims Malliaros and Neill breached as employees and officers of BAI (which give rise to the tort claims) were the same contractual duties set forth in the "Agreement Between Shareholders" (which gave rise to the released contract claims). Specifically, they contend the solicitation of business for personal advantage would not only limit Malliaros and Neill's ability to perform their contractual duties as employees of BAI, but it would also interfere with the "servicing of existing clients and developing, producing and closing new business clients." Therefore, according to appellees, these were clearly "claims under the Agreement Between Shareholders" and, thus, were the subject matter of the settlement agreement. Malliaros, Neill, and ProTech make a similar argument with respect to BAI's tortious interference claims, i.e., that such alleged interference was necessarily related to their efforts to solicit customers away from BAI in breach of the covenants not to compete and, for this reason, the tortious interference claims must be deemed to fall within the subject matter of the release, too. Finally, Malliaros, Neill, and ProTech argue that the defamation and business disparagement claims [8] were also released in the settlement agreement because the facts underlying those claims relate to post-resignation conduct undermining BAI's business and attempting to solicit

---

tal services, nursing, chiropractic services and medical expenses, past, present and future," did not bar cause of action to recover balance of salary); *Loy v. Kuykendall,* 347 S.W.2d 726, 728 (Tex.Civ.App.—San Antonio 1961, writ ref'd n.r.e.) (finding that where a pre-printed general release for all damages contained a more specific clause stating "[t]his release is only for bodily injury," it did not release claim for property damages).

8. These claims are based on allegations by Baty and BAI that Malliaros and Neill sent a letter to the Texas Department of Insurance asserting that Baty and BAI were engaged in illegal or unethical practices. BAI also complains that Malliaros and Neill wrote letters to several BAI clients alleging that Baty and BAI were engaging in misleading and illegal practices.

BAI's customers in violation of the covenants not to compete.

To support their argument that the "Agreement Between Shareholders" subsumes the common law duties they owed as officers and employees of BAI, Malliaros and Neill rely on *DeWitt County Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96 (Tex. 1999) and *R.C. Bowen Estate v. Continental Trailways, Inc.*, 152 Tex. 260, 256 S.W.2d 71 (Tex.1953), two Texas Supreme Court cases which address the effects of releasing claims where there are concomitant contractual and common law duties.

In *DeWitt*, rural property owners entered into an easement agreement with an electric cooperative. The easement agreement, which detailed the specific actions the cooperative could take to maintain the right-of-way, stated:

> The Cooperative shall have the right to clear the right-of-way of all obstructions, to cut and trim trees within the right-of-way or chemically treat trees or shrubbery with herbicides and to cut down from time to time all dead, weak, leaning, or dangerous trees that are tall enough to strike the wires in falling.

*DeWitt County Elec. Co-op, Inc.*, 1 S.W.3d at 100. When the cooperative cut down several trees in the right of way, the landowners brought suit, asserting both breach of contract and negligence claims. The Texas Supreme Court, reversing the intermediate appellate court, determined that the landowners could not maintain a negligence claim independently of their contract claim. Explaining its rationale, the *DeWitt* court stated:

> We held in *Southwestern Bell Telephone Co. v. DeLanney* that "[i]f the defendant's conduct ... would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. Conversely, if the defendant's conduct

> ... would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract."

> The court of appeals carried this statement to an illogical conclusion. A person who enters a neighbor's property and cuts down trees *with no contractual right* to do so can be held liable in tort. But when, as here, *a contract spells out the parties' respective rights about whether trees may be cut*, the contract and not common-law negligence governs any dispute about whether trees could be cut or how trees were cut.

*Id.* at 105 (emphasis added) (quoting *Southwestern Bell Tele. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex.1991)). Relying on *DeWitt*, Malliaros and Neill insist that the contractual duties set forth in the "Agreement Between Shareholders" overlap the common law duties and, thus, when BAI released them from claims under the contract, it also released them from tort claims. These appellees' reliance on *DeWitt* is misplaced.

Unlike the easement agreement in *DeWitt*, the "Agreement Between Shareholders" does not expressly or specifically address the duties in question, nor does it "spell out" the obligations Malliaros and Neill had with respect to fulfillment of those duties. Unlike the contracting parties in *DeWitt*, the signatories to the "Agreement Between Shareholders" did not undertake to replace common law duties with an agreement of their own making; rather, they merely stated in very general terms the job descriptions and responsibilities of Malliaros and Neill.

 "Certain duties, apart from any written contract, arise upon the formation of an employment relationship." *T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 21–22 (Tex.

App.—Houston [1st Dist.] 1998, pet. dism'd). Malliaros and Neill each had a common law duty not to compete with BAI *during* their employment; this duty was separate from and independent of any contractual duties they undertook in the "Agreement Between Shareholders." *See Gaal v. BASF Wyandotie Corp.*, 533 S.W.2d 152, 154–55 (Tex.Civ.App.—Houston [14th Dist.] 1976, no writ) (affirming the enjoinment of a former employee from contacting customers solicited prior to leaving employment, but observing that employer lost its right to prevent that employee from competing for customers upon the termination of employment in the absence of a post-termination covenant not to compete). As officers and employees of BAI, they also had a duty not to disclose or use BAI's confidential and proprietary information for their own benefit. *See T–N–T Motorsports, Inc.*, 965 S.W.2d at 22. Likewise, the common law imposes on all persons a general duty not to defame others. *Atlantic Lloyd's Ins. Co. of Tex. v. Susman Godfrey, L.L.P.*, 982 S.W.2d 472, 475 (Tex.App.—Dallas 1998, pet. denied). The "Agreement Between Shareholders," however, contains no express prohibition against pre-termination competition, unauthorized use of BAI's confidential and proprietary information, or disparagement of BAI, nor does it identify any of these specific common law duties as contractual obligations.

■ Texas case law has consistently held that "courts cannot make contracts for the parties." *Holman v. Meridian Oil, Inc.*, 988 S.W.2d 802, 806–07 (Tex.App.— San Antonio 1999, pet. denied) (refusing to find liquidated damages clause imposed duty to release "any lease" where the lease in question had no express provision imposing a duty to release expired leases in which no activity has occurred.) When parties have entered into a valid contract,

an appellate court does not have the power to place an interpretation upon the contract and its terms which the parties did not express. *Id.* at 806. We find that, because the "Agreement Between Shareholders" does not contain provisions expressly prohibiting or restricting the conduct which forms the basis of appellants' tort claims, this case does not present a *DeWitt* scenario.

Malliaros, Neill, and ProTech's reliance on *Bowen* is similarly misplaced. In *Bowen*, a landlord sued its tenant for negligent waste. *Bowen*, 256 S.W.2d at 71. The court rejected the landlord's argument that the landlord had a cause of action in tort for negligent waste, independent of the lease, and that liability for the tort was not covered by the release. *Id.* at 72–73. The negligent waste claim was based on the implied duty of the tenant to use ordinary care to protect the leased premises from injury other than ordinary wear and tear. In rejecting the landlord's contention, the *Bowen* court noted the parties had by "express covenant incorporated that implied covenant against waste into the lease contract." *Id.* at 73. Therefore, the *Bowen* court found "[u]nder the language of the lease contract covenants are treated as conditions and the parties have not indicated that any distinction is to be made between the two." *Id.* at 73. *Bowen* is clearly distinguishable. Here, the contracting parties did not make the common law prohibitions against pre-termination competition and post-termination business disparagement express covenants in the "Agreement Between Shareholders." Moreover, in *Bowen*, the contractual duty was identical to the common law duty, making it logical to conclude that a release covered violations of both. *Id.* That is not the case here. Although the contractual and common law duties overlap in a very broad sense, the common law imposes specific duties on current and for-

mer employees that clearly do not appear in the "Agreement Between Shareholders."

We do not read *DeWitt* and *Bowen* to hold that *any* overlap in contractual and common law duties precludes a claimant from maintaining a tort claim independently of a contract claim. Where, as here, the contract does not address the specific duties at issue (i.e., the duty not to engage in pre-termination competition with one's employer, the duty not to use or disclose an employer's confidential information, and the duty not to make defamatory or disparaging statements), then it is reasonable to conclude that the parties did not intend to supplant the common law duties or to look solely to the contract to define the obligations of the parties. Because the parties to the "Agreement Between Shareholders" included a contractual provision which expressly prohibited post-termination competition with BAI but did not include such a prohibition against pre-termination competition,[9] there is no contractual provision that subsumes that common law duty. The same holds true for the common law duties not to make unauthorized use of an employer's confidential information or defame or disparage others. For these reasons, there is no basis for concluding that only the "Agreement Between Shareholders" governs the obligations of the parties, and no reason for precluding BAI and Baty from maintaining tort claims independently of their contract claims. Therefore, we reject appellees' contention that when the parties to the settlement agreement released all claims under the "Agreement Between Share-

holders," the tort claims for breach of fiduciary duty and tortious interference (based on pre-termination conduct) and for defamation and business disparagement (based on post-termination conduct) were extinguished.

The determination of whether the parties released claims sounding in tort as well as claims sounding in contract turns on the intent of the parties as expressed in the plain language of the settlement agreement. That agreement does not mention any tort claims. It does, however, recite that the parties desire "to avoid the expense and uncertainty of *litigation concerning the two Agreements Between Shareholders.*"[10] Significantly, at the time the parties entered into the "Settlement and Rescission Agreement," the breach of fiduciary duty claims BAI and Baty had asserted against Malliaros and Neill were pending, yet the parties did not refer to these claims in the settlement agreement. Nor did the parties make any recitals concerning their desire to avoid further litigation on these claims or any other tort claims, as they did with the contract claims. This silence supports an inference that the parties did not intend to include tort claims in the settlement agreement. *See CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.,* 734 S.W.2d 653, 655 (Tex.1987) (noting that "[t]he maxim *expressio unius est exclusio alterius,* meaning that the naming of one thing excludes another," though not conclusive, was applicable to the construction of a settlement agreement). Moreover, while "parties [need not] anticipate and identify each po-

---

**9.** Notably, in the first lawsuit, the only actions BAI specifically identified as constituting a breach of contract were Malliaros and Neill's *post-termination* activities, i.e., violations of the non-compete covenant. Malliaros and Neill's *pre-termination* conduct was the subject of the breach of fiduciary duty claims

arising out of their common law duties as officers and employees of BAI. The defamation and business disparagement claims, relating to post-termination conduct, were not asserted in the first suit.

**10.** Emphasis added.

tential cause of action relating to the release's subject matter,"[11] when specific claims have been filed and are the subject of pending litigation, a failure to identify them by name strongly suggests that the parties did not intend to include them in the release.

■■■ Finally, we note the "Settlement and Rescission Agreement" does not contain the sort of provisions which would tend to support the notion that the parties intended for the disputed claims to be released. For example, the settlement agreement does not provide for the dismissal of claims with prejudice, but instead expressly states that all parties agree to dismiss their claims without prejudice. "A dismissal without prejudice means the claimant has the right to sue again on the same cause of action." *McConnell v. Attorney Gen. of Tex.*, 878 S.W.2d 281, 283 (Tex.App.—Corpus Christi 1994, no writ). Additionally, the settlement agreement does not contain any covenants or agreements not to pursue the claims asserted in the original litigation or file future claims arising out of the employment relationship. Reading the contract as a whole, we do not find that a reasonable person would have used and understood the release language to release anything other than claims specifically identified, i.e., claims based on the non-compete and/or non-solicitation provisions and other claims under the "Agreement Between Shareholders."

The role of the court is to construe the release to follow the expressions of the written instrument. We will not expand the language of the release to cover claims not specifically mentioned, nor will we infer or presume an intent of the parties to release claims that are not clearly within the scope of the agreement. Had the parties intended to release claims sounding in

tort as well as claims sounding in contract, they easily could have included language to that effect in the settlement agreement or entered into a broad form general release encompassing "claims of any nature whatsoever." They did not. We will not rewrite their settlement agreement to release claims not mentioned.

## 2. Rescission

Malliaros, Neill, and ProTech contend that, because the settlement agreement also rescinded the "Agreement Between Shareholders," its interpretation should not be limited to the release provision. Instead, they argue, this court should find that the intended and actual effect of the rescission language was "the eradication of all the contractual, employment and corporate relationships out of which any claim for breach of fiduciary duty could be based."

■■■ As a general rule, rescission puts an end to a contract. *Taylor v. Gill*, 211 S.W.2d 363, 366–67 (Tex.Civ.App.—Eastland 1948, no writ). Under Texas law, the parties may mutually agree to rescind a contract, thereby restoring the *status quo ante*. *Sid Richardson Carbon & Gasoline Co. v. Interenergy Res., Ltd.*, 99 F.3d 746, 754 (5th Cir.1996). Upon rescission of a contract, "[t]he rights and liabilities of the parties are extinguished and they are restored to the relative positions which they would have occupied if no such contract had ever been made." *Taylor*, 211 S.W.2d at 367; *see also Allen v. Allen*, 751 S.W.2d 567, 573 (Tex.App.—Houston [14th Dist.] 1988, writ denied), *overruled on other grounds by Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41 (Tex. 1998); *Manges v. Guerra*, 621 S.W.2d 652, 658 (Tex.Civ.App.—Waco 1981), *aff'd, in*

11. *Keck, Mahin & Cate,* 20 S.W.3d at 698.

*part, and rev'd, in part, on other grounds,* 673 S.W.2d 180 (Tex.1984).

�in By the rescission language in the settlement agreement, the parties intended to restore each of the signatories to their former positions, i.e., Malliaros and Neill agreed to return their stock to BAI, and BAI, in turn, agreed that the non-compete and non-solicitation covenants were no longer of any effect. While the rescission provision in the settlement agreement restores the parties to their former positions, it does not, as appellees urge, accomplish a comprehensive conclusion of their legal relationship and all claims between and among them. Indeed, one can only undo by rescission what one has done by agreement. In other words, contractual rescission is an agreement by contracting parties to discharge contractual duties; it does not operate to discharge tort claims. *See Tuttlebee v. Tuttlebee,* 702 S.W.2d 253, 257 (Tex.App.—Corpus Christi 1985, no writ) (observing that, in the event any cause of action exists in favor of either party against the other, it is necessarily independent of the contract and separate and apart from any of the terms of the contract); *Taylor,* 211 S.W.2d at 367 (same); *Stinson v. Sneed,* 163 S.W. 989, 991 (Tex.Civ.App.—Amarillo 1914, no writ) (same).

Malliaros and Neill were agents and employees of BAI before they signed the "Agreement Between Shareholders." As agents and employees, Malliaros and Neill owed common law duties of loyalty to BAI,

which precluded them from soliciting customers and business away from BAI prior to leaving their employment. *See Gaal,* 533 S.W.2d at 154–55. Therefore, notwithstanding the rescission of the "Agreement Between Shareholders," Malliaros and Neill still owed fiduciary duties to their employer and any claims for breach of those duties survive the rescission. *See Tuttlebee,* 702 S.W.2d at 257; *Taylor,* 211 S.W.2d at 367; *Stinson,* 163 S.W. at 991.[12]

■ We find that neither the release nor rescission language in the settlement agreement operates to release any of the tort claims Baty and BAI have asserted against Malliaros, Neill, and ProTech. Additionally, because BAI's tort claims against the insurance companies (Aetna, Hartford, AMS, and Fidelity) are derivative of its claims against Malliaros, Neill, and ProTech, we find the settlement agreement did not release those claims either.

Having determined that the settlement agreement did not release the claims against the insurance companies, we now must consider whether the insurance companies were entitled to summary judgment on the other grounds asserted.

### B. Tortious Interference with Existing Contracts

■ Aetna, Hartford, AMS, and Fidelity moved for summary judgment on BAI's claim for tortious interference with existing contracts based on the defense of justification. The elements of tortious in-

---

**12.** ProTech, Malliaros, and Neill rely on *Bowen* to support their argument that the rescission language eradicated any tort claims. *See R.C. Bowen Estate v. Continental Trailways, Inc.,* 152 Tex. 260, 256 S.W.2d 71 (1953). *Bowen,* however, is distinguishable. First, in *Bowen,* the entire landlord/tenant relationship was based on the contract; that is, there had been no landlord/tenant relationship before the parties entered into the lease. Here, an employer/employee relationship existed between BAI and Malliaros and Neill separate and apart from, and prior to, the "Agreement Between Shareholders." Second, in *Bowen,* the parties entered into an agreement "unequivocally releasing the [tenant] from responsibility for waste." *Id.* at 73. As previously noted, there is no comparable release language in the "Settlement and Rescission Agreement."

terference with a contract are: (1) the existence of a contract subject to interference; (2) the occurrence of an act of interference that was willful and intentional; (3) the act was a proximate cause of the claimant's damage; and (4) actual damage or loss occurred. *Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex.1998). Merely entering into a contract with a party with the knowledge of that party's contractual obligations to someone else is not the same as inducing a breach. *John Paul Mitchell Sys. v. Randalls Food Mkts., Inc.*, 17 S.W.3d 721, 731 (Tex. App.—Austin 2000, pet. denied). Moreover, inducing a contract obligor to do what it has a right to do is not actionable interference. *ACS Invs., Inc. v. McLaughlin*, 943 S.W.2d 426, 431 (Tex. 1997).

Even if the plaintiff establishes all the elements of a claim for tortious interference with a contract, the defendant may avoid liability if it establishes the elements of the defense of justification. *Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.*, 29 S.W.3d 74, 77–78 (Tex.2000). A party is privileged to interfere with the contractual relations of another if: (1) it acts in the bona fide exercise of its own rights, or (2) the interfering party has an equal or superior right in the subject matter to that of the party to the contract. *Id.* at 80. Justification is established as a matter of law when the defendant's acts, which the plaintiff claims constitute tortious interference, are merely done in the defendant's exercise of its own contractual rights, regardless of motive. *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex.1996).

Here, we need not decide whether the insurance companies took any action to interfere with BAI's contracts with its clients. Instead, we find that the insurance companies' actions in granting the agency appointments were taken in the exercise of their own contractual rights. As insurers with third party contracts, these companies each had the legal right to appoint their own insurance agents and, thereby, had the right to contract with Malliaros, Neill, and ProTech. More importantly, the insurance companies were contractually obligated to honor any change in agency appointments submitted by their insureds. *See Crockett v. Great-West Life Assur. Co.*, 578 So.2d 1290, 1295–96 (Ala.1991) (finding that where the contract between the insurer and the insured provided the insured with the right to change the designation of agent of record at any time, there was no tortious interference with a contractual relationship); *Hoffman v. Hagedorn & Co.*, 100 Misc.2d 779, 420 N.Y.S.2d 75, 76 (1979) (finding that it was the insurer's duty to comply with the insured's desire to change the designation of writing agent, and it was not in the province of the insurer to inquire into the reasons for the desired change).[13] Thus, in entering into agency agreements with Malliaros, Neill, and ProTech, the insurance companies were not only exercising contractual rights but were endeavoring to discharge their own contractual obligations to third parties. Consequently, their actions in giving agency appointments to Malliaros, Neill, and ProTech were legally justified. *See Prudential Ins. Co. of Am.*, 29 S.W.3d at 80. We find the trial court properly granted summary judgment in favor of Aetna, Hartford, AMS, and Fidelity on BAI's claims for tortious interference with existing contracts.

---

**13.** BAI has cited no authority to support either the notion that Aetna, Hartford, AMS, and Fidelity have no right to appoint their own agents or the notion that these insurance companies have no obligation to honor the wishes of their insureds in changing agents.

### C. Tortious Interference with Prospective Business Relationships

Aetna, Hartford, AMS, and Fidelity also moved for summary judgment on BAI's claims for tortious interference with prospective business relationships on the defense of justification. In our original opinion, we analyzed these claims in much the same fashion as BAI's tortious interference with contract claims, and affirmed summary judgment in favor of the insurance companies on the ground that the insurance companies were legally justified in their actions. We based our original opinion on the Texas Supreme Court's holding in *Prudential* that justification is an affirmative defense to a claim for tortious interference with a prospective business relationship. *See Prudential Ins. Co. of Am.*, 29 S.W.3d at 80. However, since we issued our original opinion, the Texas Supreme Court has re-evaluated the law governing claims for interference with a prospective business relationship and has placed restrictions on when a defendant may assert the affirmative defense of justification or privilege to that claim. *See Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726–27 (Tex.2001).

■ Now, to recover on a claim for tortious interference with a prospective business relationship, the plaintiff must establish the defendant's conduct is independently tortious. *Id.* at 726. In *Sturges*, the Texas Supreme Court emphasized that it is not necessary for the plaintiff to prove an independent tort, only that the plaintiff establish the defendant's conduct would be actionable under a recognized tort. *Id.* In so defining this claim, the *Sturges* court concluded that the concepts of justification and privilege are subsumed in the plaintiff's proof and, restrict the availability of the affirmative defense of justification or privilege to those cases in which justification or privilege is a defense to the independent tortiousness of the defendant's conduct. *Id.* at 726–27. By way of example, the *Sturges* court pointed out that "a statement made against the plaintiff, though defamatory, may be protected by a complete or qualified privilege." *Id.* at 727. "Otherwise, the plaintiff need not prove that the defendant's conduct was not justified or privileged, nor can a defendant assert such defenses." *Id.* In explaining its rationale for this rule, the Texas Supreme Court stated:

> In reaching this conclusion we treat interference with prospective business relations differently than tortious interference with contract. It makes sense to require a defendant who induces a breach of contract to show some justification or privilege for depriving another of benefits to which the agreement entitled him. But when two parties are competing for interests to which neither is entitled, then neither can be said to be more justified or privileged in this pursuit. If the conduct of each is lawful, neither should be heard to complain that mere unfairness is actionable. *Justification and privilege are not useful concepts in assessing interference with prospective relations, as they are in assessing interference with an existing contract.*

*Id.* (emphasis added).

Each of the insurance companies moved for summary judgment on BAI's claims of tortious interference with prospective business relationships on the affirmative defense of justification. Neither the parties nor the trial court had the benefit of *Sturges* at the time of summary judgment. Aetna[14], AMS, and Fidelity, how-

---

**14.** BAI claims that Aetna did not move for summary judgment on its claim for tortious

ever, also filed no-evidence motions for summary judgment under Rule 166a(i) on the elements of BAI's claim for tortious interference with prospective business relationships. *See* Tex.R. Civ. P. 166a(i). Hartford did not file a no-evidence motion for summary judgment, but instead, asserted in its traditional motion for summary judgment that it cannot be liable for interfering with its own contracts. Thus, we must now address the elements of BAI's proof in its claim for tortious interference with prospective business relationships, as set forth in the insurance companies' motions for summary judgment.

We begin by noting that the Texas Supreme Court has never set forth the elements of a claim for tortious interference with prospective business relationships. *See Prudential Ins. Co. of Am.*, 29 S.W.3d at 78 (stating "[w]e have never enumerated the elements of a cause of action for tortious interference with prospective contracts, although we have concluded that justification is an affirmative defense"). Although it found that justification is not an affirmative defense to tortious interference with prospective business relationships, and although it imposed on the claimant the obligation to establish that the defendant's conduct would be actionable under a recognized tort, the *Sturges* court did not identify or articulate the specific elements of that claim, as modified.

Prior to *Sturges*, to establish a claim for tortious interference with a prospective business relationship, the plaintiff had to show: (1) a reasonable probability that it would have entered into a business relationship; (2) the defendant acted maliciously by intentionally preventing the formation of the relationship with the purpose of harming the plaintiff; (3) the plaintiff was without justification;[15] and (4) the plaintiff suffered actual harm or damage as a result. *Robles*, 965 S.W.2d at 561. This court has previously viewed the term "malice" in this type of action as a term of art meaning "intent." *RRR Farms, Ltd. v. American Horse Prot. Ass'n, Inc.*, 957 S.W.2d 121, 131 n. 6 (Tex.App.—Houston [14th Dist.] 1997, pet. denied). According to *Sturges*, the concepts of "malice, justification, and privilege provide . . . no meaningful description of culpable conduct." *Sturges*, 52 S.W.3d at 726. Thus, it appears that the plaintiff would no longer need to show the defendant acted maliciously. In another recent case decided shortly after *Sturges*, the Texas Supreme Court stated with regard to a claim for tortious interference with a prospective business relationship:

> [I]nterference is intentional "if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result." . . . But the *Restatement* further pro-

interference with prospective business relationships. A review of the record, however, reveals that Aetna moved for summary judgment on this claim. Furthermore, it appears from reviewing BAI's response to motions for summary judgment filed by Aetna, AMS and Fidelity, that although BAI addressed the affirmative defense of justification, it did not address the elements of the claim for tortious interference with prospective business relationships as set forth in the no-evidence motions for summary judgment. Also, although

BAI addressed this claim against AMS on appeal, it failed to brief it against Aetna and Fidelity. Regardless, as explained below, BAI cannot establish all the elements of a claim for tortious interference with prospective business relationships.

15. Although justification is listed as an element of the plaintiff's claim, it is actually an affirmative defense. *Robles v. Consol. Graphics, Inc.*, 965 S.W.2d 552, 561 n. 11 (Tex. App.—Houston [14th Dist.] 1997, no pet.).

vides that "[i]f [the actor] had no desire to effectuate the interference by his action but knew that it would be a mere incidental result of conduct he was engaging in for another purpose, the interference may be found to be not improper."
*Bradford v. Vento,* 48 S.W.3d 749, 757 (Tex.2001) (quoting RESTATEMENT (SECOND) OF TORTS § 766B cmt. d (1979)).

■ In light of *Sturges* and *Bradford,* the elements of a claim for tortious interference with a prospective business relationship appear to be: (1) a reasonable probability that the plaintiff would have entered into a business relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference. *Ash v. Hack Branch Distrib. Co.,* 54 S.W.3d 401, 414–15 (Tex.App.—Waco 2001, pet. filed).

BAI claims summary judgment was improper on its claim for tortious interference with prospective business relationships with BAI's customers. With respect to this claim, BAI asserts that, without the insurance companies' granting of agency appointments to ProTech, Malliaros and Neill would not have had the same ability to approach the insureds about moving their business from BAI to ProTech. In essence, BAI claims that without the agency appointments, Malliaros and Neill could not have diverted BAI's business to ProTech. In support of this assertion, Baty states in his affidavit:

Through discovery in this lawsuit, I learned that Ms. Neill and Ms. Malliaros approached most of the insurance companies then being represented by BAI and sought an appointment of their new firm as an agent for those companies....

The insurance companies which agreed with Ms. Neill and Ms. Malliaros to appoint ProTech as an agent caused particular harm to BAI. The agency appointments by those insurers gave Ms. Neill and Ms. Malliaros the means to approach BAI's existing clientele and offer them an easy switch of agent. With the appointments, the BAI officers had the ability to switch insurance agents either in the middle of a policy year or upon renewal without having to switch insurance carriers.

In my experience, it would have been much more difficult for BAI's former employees to persuade BAI clients to stop doing business with BAI if it had been necessary for the customers to switch insurance carriers as well as independent agents. The fact that ProTech was able to offer policies from BAI's existing carriers made it easy for ProTech to target BAI's customer base.

BAI also points to Malliaros's deposition in which she testified that none of the insurance companies to which she and Neill had spoken discouraged them from leaving BAI. Malliaros further explained:

Everyone gave us the indication that it was possible to have a contract. No one actually said we could have a contract. Nobody actually said we couldn't have a contract. All the indications were that it was positive.

■ To prevail on a claim for tortious interference with a prospective business relationship, the plaintiff must establish that the defendant intentionally prevented the formation of the business relationship.

*Bradford,* 48 S.W.3d at 757.[16] Aetna, AMS, and Fidelity each moved for summary judgment on the ground that there was no evidence they intentionally interfered with BAI's prospective business relationships. The insurance companies argued that by granting ProTech an agency appointment, they did not intentionally prevent the formation of business relationships between BAI and its customers, and that their actions do not rise to the level that would subject them to liability for tortious interference with prospective business relationships.

### 1. Aetna

Neill and Malliaros met with Dennis Devlin of Aetna in June 1994, two months before they left BAI, to test the level of support they could expect if they went out on their own. Devlin indicated that Malliaros and Neill would have to leave BAI before "any contractual arrangements could be made." In mid-November 1994, Neill sent a copy of the Settlement Agreement to Devlin. In early January 1995, four months after Malliaros and Neill had left BAI, Devlin recommended that ProTech receive an agency appointment from Aetna. In making this recommendation, Devlin was aware that Malliaros and Neill hoped to take a substantial percentage of Aetna business from BAI.

We find no evidence under these facts that Aetna intentionally prevented the formation of any relationships between BAI and any Aetna insureds. Evidence that Malliaros and Neill could expect to receive support from Aetna if they formed their own agency cannot be reasonably construed as an act to prevent the formation of a business relationship between one of Aetna's other agents (BAI) and any existing or potential Aetna insureds. Mere participation in the transaction is not sufficient to establish an intentional action to harm BAI. *See John Paul Mitchell Sys.,* 17 S.W.3d at 731; *see also Texaco, Inc.,* 729 S.W.2d at 803 (observing that "[m]erely entering into a contract with the knowledge of that party's contractual obligations to someone else is the not the same as inducing a breach" and stating plaintiff must show defendant took active part in persuading party to breach contract). Nor does Devlin's knowledge that Malliaros and Neill would be attempting to move a substantial amount of Aetna business from BAI to ProTech show that by granting an agency appointment to ProTech, Aetna sought to intentionally interfere with BAI's relationships with its insureds. *See Davis,* 839 S.W.2d at 140 (stating plaintiff must show defendant knowingly induced breach; it is not sufficient that defendant reaped advantages of broken contract). Therefore, summary judgment in favor of Aetna on BAI's claim for tortious interfer-

---

16. *See, e.g., Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 927 (Tex.1993) (finding defendant's conduct did not involve knowing inducement as required to establish tortious interference); *John Paul Mitchell Sys. v. Randalls Food Mkts., Inc.,* 17 S.W.3d 721, 730–31 (Tex.App.—Austin 2000, pet. denied) (stating it is necessary that there be some act of interference or of persuading party to breach for tort liability to arise; merely participating in transaction does not constitute knowing inducement required to impose liability for tortious interference); *Davis v. Hyd-Pro, Inc.,* 839 S.W.2d 137, 140 (Tex.App.— Eastland 1992, writ denied) (stating plaintiff must show defendant knowingly induced breach; it is not sufficient that defendant reaped advantages of broken contract); *Texaco, Inc. v. Pennzoil Co.,* 729 S.W.2d 768, 803 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (stating plaintiff must show defendant took active part in persuading party to breach contract); *Arabesque Studios, Inc. v. Academy of Fine Arts, Int'l, Inc.,* 529 S.W.2d 564, 568 (Tex.Civ.App.—Dallas 1975, no writ) (stating it is incumbent upon plaintiff to demonstrate that defendant actually caused or brought about interference).

ence with a prospective business relationship is proper.

## 2. AMS

■ BAI complains that AMS gave ProTech an agency appointment before Malliaros and Neill left BAI, thereby interfering with BAI's prospective business relationships. Merely granting an agency appointment to ProTech prior to the time that Malliaros and Neill left BAI, without more, is not sufficient to raise a fact issue on the intentional act of interference element. *See John Paul Mitchell Sys.,* 17 S.W.3d at 731; *Davis,* 839 S.W.2d at 140; *Texaco, Inc.,* 729 S.W.2d at 803. BAI presented no evidence that AMS solicited or encouraged Malliaros and Neill to leave BAI, to set up their own agency in competition with BAI, or to solicit BAI's customers. Accordingly, the trial court did not err in granting summary judgment in favor of AMS on BAI's claim for tortious interference with prospective business relationships.[17]

## 3. Fidelity

■ Neill and Malliaros contacted Fidelity about an agency appointment prior to leaving BAI. A few weeks after Malliaros and Neill left BAI, in mid-September 1994, ProTech submitted an application to Fidelity for an agency appointment, and the following week Fidelity granted ProTech the appointment. BAI presented no evidence that Fidelity, in granting ProTech an agency appointment, intended to interfere with any business relationships between BAI and its insureds. Fidelity did not cancel its agency agreement with BAI after Malliaros and Neill left BAI to form ProTech, but, instead, continued to do business with BAI. BAI presented no

evidence that Fidelity encouraged its insureds not to do business with BAI or to change its agents from BAI to ProTech. In his deposition testimony, Rick Baty stated he had no knowledge of Fidelity's having contacted BAI's customers and telling them not do business with BAI, and when Baty talked to BAI's customers who were Fidelity insureds, those customers told him it was Malliaros and Neill that had contacted them. Because BAI failed to come forward with any evidence of conduct by Fidelity that would amount to an act intended to prevent the formation of a business relationship with BAI, the trial court did not err in granting summary judgment for Fidelity on BAI's claim for tortious interference with prospective business relationships. *See John Paul Mitchell Sys.,* 17 S.W.3d at 731; *Davis,* 839 S.W.2d at 140; *Texaco, Inc.,* 729 S.W.2d at 803.

## 4. Hartford

Unlike Aetna, AMS, and Fidelity, Hartford did not file a no-evidence motion for summary judgment challenging the elements of BAI's claim for tortious interference with prospective business relationships. Instead, Hartford moved for summary judgment on the ground that it is not liable for interfering with its own contracts or business relationships. *See Friendswood Dev. Co. v. McDade & Co.,* 926 S.W.2d 280, 283 (Tex.1996) (holding party to contract cannot tortiously interfere with own contract). However, BAI's complaint in this case is that Hartford interfered with BAI's contracts and prospective business relationships with BAI's customers, not that Hartford somehow interfered with its own contracts and relationships with its own insureds. Hart-

---

17. Because we find summary judgment was proper on this ground, we need not reach AMS's argument that there was no evidence

that AMS's alleged conduct proximately caused any damage to BAI.

ford failed to address BAI's claim for tortious interference with prospective business relationships as pleaded and, therefore, summary judgment on this ground is improper. With the exception of its justification defense, which, after *Sturges,* is no longer applicable to a claim for tortious interference with prospective business relationships, Hartford set forth no grounds for summary judgment on this claim.

We are mindful that "[w]hen the applicable law changes during the pendency of the appeal, the court of appeals must render its decision in light of the change in the law." *Blair v. Fletcher,* 849 S.W.2d 344, 345 (Tex.1993). In this case, however, the Texas Supreme Court *added* an element to the plaintiff's proof, i.e., that the defendant's conduct must be independently tortious. *Sturges,* 52 S.W.3d at 726. Hartford did not move for summary judgment on the ground that its conduct was not independently tortious. Although we recognize that Hartford did not have the benefit of *Sturges* when it filed, and the trial court granted, the traditional motion for summary judgment, in Texas summary judgment practice, all grounds must be expressly presented in the motion. *See McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993). Therefore, we will not address the new element as it concerns BAI's claim for tortious interference with prospective business relationships against Hartford. In light of the procedural posture of this case, we must reverse the summary judgment granted in favor of Hartford on BAI's claim for tortious interference with prospective business relationships and remand that claim to the trial court.

### D. Inducing Breach of Fiduciary Duty

Aetna, Hartford, AMS, and Fidelity also moved for summary judgment on BAI's claim that they induced Malliaros and Neill to breach their fiduciary duties to BAI. The insurance companies maintain they are not liable for any action they might have taken to induce or further any breach by Malliaros and Neill because they had a legal right to enter into agency contracts with Malliaros, Neill, and ProTech.

"It is settled as the law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such." *Kinzbach Tool Co. v. Corbett–Wallace Corp.,* 138 Tex. 565, 160 S.W.2d 509, 514 (1942); *Kline v. O'Quinn,* 874 S.W.2d 776, 786 (Tex.App.—Houston [14th Dist.] 1994, writ denied). This rule, however, does not apply where the third party is doing that which he has a legal right to do. *Texas Beef Cattle Co.,* 921 S.W.2d at 211.

BAI maintains that the affirmative defense of legal justification or privilege is not applicable as a defense to a claim for third party breach of fiduciary duty because "a third party is never privileged to assist in the breach of fiduciary duty." To the contrary, the very definition of inducing the breach of a fiduciary duty set forth in the Restatement of Agency provides for the defense of justification or privilege: "A person, *who without being privileged to do so,* intentionally causes or assists an agent to violate a duty to his principal is subject to liability to the principal." RESTATEMENT (SECOND) OF AGENCY § 312 (1958) (emphasis added). The comment to the Restatement further provides: "Privileges to this are rare; business competition does not give rise to one." *Id.,* § 312 cmt. a. The actions in this case are not based on business competition, but, as noted above, on a contractual obligation to honor an insured's request for change in the agency appointment. Aetna, Hartford,

AMS, and Fidelity each had the legal right to enter into agency contracts with Malliaros, Neill, and ProTech. Moreover, each of these companies were *contractually obligated* to honor any change in agency appointments submitted by their insureds, and thus were subject to potential liability to their insureds for failing to honor such changes. *See Crockett*, 578 So.2d at 1295–96; *Hoffman*, 420 N.Y.S.2d at 76. Under these circumstances, the trial court did not err in granting summary judgment on BAI's claims alleging Aetna, Hartford, AMS, and Fidelity induced Malliaros and Neill to breach a fiduciary duty because these insurance companies' actions cannot support such a claim as a matter of law.

### E. Civil Conspiracy

■■■■ BAI brought claims against the insurance companies for civil conspiracy to commit tortious interference with existing contracts and prospective business relationships and to induce Malliaros and Neill to breach the fiduciary duties they owed BAI. A civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose by unlawful means. *Operation Rescue–Nat'l v. Planned Parenthood of Houston & S.E. Tex., Inc.*, 975 S.W.2d 546, 553 (Tex.1998). The elements of civil conspiracy are: (1) two or more persons, (2) an object to be accomplished, (3) a meeting of minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages. *Id.* Because the defendant's liability depends on its participation in some underlying tort for which the plaintiff seeks to hold the defendant liable, conspiracy is considered a derivative tort. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex.1996). Therefore, to prevail on a civil conspiracy claim, the plaintiff must show that the defendant was liable for some underlying tort. *Trammell Crow Co. No. 60 v. Harkinson*, 944 S.W.2d 631, 635 (Tex.1997).

Because the trial court properly granted summary judgment on BAI's claims for tortious interference with existing contracts and inducing a breach of a fiduciary duty, Aetna, Hartford, AMS, and Fidelity cannot be held liable on those claims and, therefore, they cannot be liable for civil conspiracy with respect to those claims. Furthermore, because the summary judgment on BAI's claim for tortious interference with prospective business relationships in favor of Aetna, AMS, and Fidelity was proper, they also cannot be liable for civil conspiracy as to that underlying claim. With respect to Hartford, the trial court erred in granting summary judgment on the tortious interference with prospective business relationships claim. However, we find BAI waived its civil conspiracy claim on appeal by failing to raise or brief it as an issue. *See* Tex.R.App. P. 38.1. Accordingly, we affirm the granting of summary judgment on BAI's claim for civil conspiracy in favor of Aetna, Hartford, AMS, and Fidelity.

### IV. Conclusion

The trial court erred in granting summary judgment on the tort claims Baty and BAI asserted against Malliaros, Neill, and ProTech and, therefore, we reverse that portion of the summary judgment and remand those claims for further proceedings. We affirm the summary judgment in favor of Aetna, Hartford, AMS, and Fidelity on BAI's claims for tortious interference with existing contracts, inducing the breach of a fiduciary duty, and civil conspiracy. We further affirm the summary judgment in favor of Aetna, AMS, and Fidelity on BAI's claim for tortious interference with prospective business relationships, but reverse the summary judgment in favor of Hartford on that claim and remand that claim for further proceedings. Accordingly, the judgment of the trial

court is affirmed, in part, and reversed and remanded, in part.